IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA        )
                                )
            v.                  )        Criminal No. 05-25 Erie
                                )
LEON F. AKERLY II               )


**GOVERNMENT'S MEMORANDUM REGARDING SENTENCING FACTORS**

        AND NOW comes the United States of America, by and through its counsel, Mary Beth Buchanan, United States Attorney for the Western District of Pennsylvania, and Christine A. Sanner, Assistant United States Attorney for said district, and states:


**I.    INTRODUCTION**

        On June 7, 2005, a federal grand jury returned a one-count indictment against Leon F. Akerly, II, charging him with the possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).  On December 6, 2005, Akerly entered a plea of guilty.

        On March 24, 2006, the U.S. Probation and Pretrial Services Office ("Probation Office") prepared a Presentence Investigation Report ("PSR").  By letter dated April 18, 2006, the defendant sent objections to the Probation Office.  On April 25, 2006, the Probation Office filed its First Addendum to the PSR, standing by its initial report, and noting that, in any event, the facts that the defendant objected to would have no impact upon the

range under the guidelines.

On May 8, 2006, the Probation Office filed a Second Addendum, noting that the Office of Children and Youth had investigated the defendant following the recent death of his wife, and had determined that the defendant's children could be cared for, during the period of the defendant's incarceration, by their grandparents and/or aunts. See PSR Second Addendum.

Additionally, by letter dated April 26, 2006, the Probation Office notified this Court that the defendant had violated a condition of his release on bond. Specifically, a search of the defendant's home recovered more than an ounce of marijuana, a digital scale, and $1700 in U.S. currency. See PSR Second Addendum. State charges are currently pending against the defendant for this offense, and a preliminary examination is set for June 2, 2006. Despite these new charges, and the defendant's failure to comply with the conditions of his bond, the Probation Office did not recommend that this Court revoke the defendant's bond, due to the proximity of his upcoming sentencing before this Court, which is set for May 16, 2006.

As of the date of this Memorandum, the defendant has not yet filed any motion seeking a downward departure from the recommended guidelines range. And, as the Probation Office noted in its First Addendum, none of the defendant's objections to the PSR would impact the guidelines range in this case. In this

regard: the instant offense has a base level of 20, due to the defendant's prior felony conviction for a crime involving a controlled substance, PSR ¶20, and is increased by 2 because, as listed in the Indictment, and as the defendant admitted during the plea colloquy, he possessed four firearms. <u>See</u> PSR ¶19 (offense level is increased pursuant to USSG § 2K2.1(b)(1) when offense involves three or more firearms). The defendant did not object to this calculation.

Nonetheless, in anticipation that the defendant may orally seek a downward departure from the guidelines range during the sentencing hearing on May 16, 2006, the undersigned respectfully submits the following. As set forth below, a downward departure on any of the following grounds, if they are raised, would be entirely without merit and should be denied.

## II.  <u>ARGUMENT</u>

### A.  <u>Applicability of the United States Sentencing Guidelines</u>

Under 18 U.S.C. § 3553(a), the sentencing court is to consider, and give meaningful consideration to, the following relevant factors:

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  the need for the sentence imposed --

(A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

3

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . .

United States v. Cooper, 437 F.3d 324, 329 (3d Cir. 2006).

If, after considering these factors, the sentence then imposed falls within the guidelines range, it is likely to be reasonable. Id. at 332.

Importantly, in commenting upon the advisory guidelines range post-Booker, the Third Circuit advised in Cooper that the "Sentencing Guidelines represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses." Id. at 331 n.10 (quoting United States v. Mykytiuk, 415 F.3d 606, 607 (7th Cir. 2005) and citing United States v. Booker, 543 U.S. 220 (2005)). The Third Circuit added:

The federal sentencing guidelines represent the collective determination of three governmental bodies -- Congress, the Judiciary, and the Sentencing Commission -- as to the appropriate punishments for a wide range of criminal conduct. Congress's intent [was] to assure that sentences are fair both to the offender and to society, and that such fairness is reflected both in the individual case and in the pattern of sentences in all

4

federal criminal cases.

Id. at 331 n.10 (citations and internal quotation marks omitted).

In cases where there is a disputed portion of the PSR or other controverted matter, the Court must either rule on the dispute or determine that a ruling is unnecessary. Fed. R. Crim. P. 32(i)(3)(B). A ruling on a disputed matter is unnecessary when the matter will not affect sentencing, or when the Court will not consider the matter in sentencing. United States v. Ameline, 409 F.3d 1073, 1085 (9th Cir. 2005)(citing Fed.R.Crim.P. 32(i)(3)(B)).

As reflected by the First and Second Addendums to the PSR, the defendant voiced several objections to the Probation Office. Among other things, the defendant apparently objected to the fact that the PSR noted that the catalyst for the intrusion of his home (after which the defendant, a convicted felon, fired warning shots into the woods) was the intruders' belief that the defendant possessed cash, marijuana, and methamphetamine. See Second Addendum at 1-2. The defendant points out that -- although cash and marijuana was found in his home in April 2006, and notwithstanding his prior conviction for possession with intent to distribute marijuana -- no marijuana or cash was actually uncovered during the search of his home in February 2005.

However, as the Probation Office correctly determined, this objection, as well as all of the other objections the defendant raised, has no bearing upon the recommended guidelines

5

range. See First Addendum at 1-7. As noted above, the offense level in this case is based upon the number of weapons the defendant possessed (four), and his prior conviction for, *inter alia*, possession with intent to distribute marijuana. The defendant has not objected to this calculation. In fact, he admitted exactly this during his plea colloquy before this Court.

Accordingly, under Fed. R. Crim. P. 32(i)(3)(B), should the defendant raise any similar factual dispute during the sentencing hearing, this Court may determine that a ruling on any such controverted matter is unnecessary because the matter does not impact the applicable sentencing guidelines range. See PSR First Addendum, see also, e.g., U.S. v. Fields, 39 F.3d 439, 447 (3d Cir. 1994) (resolution of a factual dispute would not change the guidelines range, and so the court need not resolve the dispute); U.S. v. Woods, 976 F.2d 1096, 1102 (7th Cir. 1992); U.S. v. Williams, 919 F.2d 1451, 1458 (10th Cir. 1990); U.S. v. Lopez-Cavasos, 915 F.2d 474, 476 (9th Cir. 1990).

However, although such contested matter does not impact the guidelines range applicable in this case, should this Court desire an evidentiary hearing on any contested or controverted matter contained within the PSR, the government will stand ready with witnesses who can testify to any such matter during the sentencing hearing.

Next, to the extent that the defendant seeks a downward

departure from the guidelines range during the sentencing hearing, the government notes that the burden of proof and persuasion is on the defendant.  <u>Ameline</u>, 409 F.3d at 1085.  This is because, although the government has the burden of proof regarding the offense level determination, the defendant has the burden of proof regarding any downward departure.  <u>Id</u>.  The standard of proof is by a preponderance.  <u>Cooper</u>, 437 F.3d at 330 (citations omitted).

The Supreme Court has articulated four questions which a sentencing court should ask in determining whether a departure should be granted:

> 1) What features of this case, potentially, take it outside of the Guidelines' "heartland" and make of it a special, or unusual case?
>
> 2) Has the Commission forbidden departures based on those features?
>
> 3) If not, has the Commission encouraged departures based on those features?
>
> 4) If not, has the Commission discouraged departures based on those features?

<u>Koon v. United States</u>, 518 U.S. 81, 95 (1996)(quoting <u>United States v. Rivera</u>, 994 F.2d 942, 949 (1st Cir. 1993)).  For all of the foregoing reasons, a downward departure on any of the following grounds, if raised, should be denied. [1]

---

[1] The government reserves its right to respond should the defendant, subsequent to the filing of the instant memorandum, raise any ground for departure not adequately addressed herein.

B.    **"Over-Representation" of Criminal History**

Should the defendant seek a downward departure based on the argument that his criminal history category over-represents his past criminal conduct, such motion should be denied.  With 6 criminal history points, the defendant falls at the very uppermost end of a criminal history category III, which has a range of 4 to 6 criminal history points.

First of all, in calculating the defendant's criminal history category, the Probation Office properly assigned three points arising from the defendant's 1993 conviction for possessing, with intent to distribute, 1 ½ pounds of marijuana (PSR ¶30).  The defendant was sentenced to 9 to 18 months' incarceration, and he completed supervision for this offense in November 1999 (PSR ¶30).

The defendant next offended in February 21, 2001, when he violated an Erie County Court of Common Pleas Protection from Abuse Order, and was sentenced to 5 months' probation (PSR ¶31).  After the defendant's probation was revoked, he was sentenced to 2 to 6 months' incarceration (PSR ¶31).  Because this sentence of imprisonment exceeded 60 days, the defendant properly received 2 criminal history points for this conviction (PSR ¶31).

On March 16, 2001, after again violating a court order, the defendant was sentenced to 30 days' imprisonment (PSR ¶33).  He received 1 criminal history point for this violation (PSR ¶33).

Objecting to the PSR, the defendant argued that the

8

points he received for these various offenses overstate his criminal history. The Probation Office, however, disagreed with the defendant's conclusion. See PSR Second Addendum.

As to the defendant's domestic violence history, and failure to comply with court orders, the PSR shows that the Erie County Court of Common Pleas granted a Protection from Abuse Order against the defendant on December 28, 2000 (PSR ¶31). On February 21, 2001, the defendant violated this order and was arrested (PSR ¶31). The next day, February 22, 2001, the defendant again violated the court order and was, again, arrested by the Pennsylvania State Police (PSR ¶32). On March 2, 2001, the defendant was sentenced to 5 months' probation on each of the two separate violations (PSR ¶¶31, 32). Then, on March 8, 2001, the defendant was found to have violated the court's order for the third time (PSR ¶33). This time, the defendant was sentenced, on March 16, 2001, to 30 days' incarceration (PSR ¶33). Finally, on April 9, 2001, the defendant's probation was revoked on the first two offenses, and he was sentenced to 2 to 6 months' imprisonment (PSR ¶¶31, 32). After serving this sentence, the defendant completed supervision on March 15, 2002 (PSR ¶32).

The government notes that even one criminal history point for these repeated violations of court orders would place the defendant squarely within category III. See also PSR First Addendum. Accordingly, as the Probation Office properly found, the

defendant's criminal history category does not over-represent the seriousness of his past offenses.  A criminal history category III fairly represents the defendant's prior offenses for, *inter alia*, possessing with intent to distribute more than 1 ½ pounds of marijuana and repeatedly violating various court orders.  Notably, since the defendant's 1993 conviction, he has been imprisoned or under supervision from that date through November 1999, and then either imprisoned or under supervision from February 2001 through March 2002.  See United States v. Moore-Bey, 981 F.Supp. 688 (D.C. 1997), aff'd, 159 F.3d 638 (D.C. Cir. 1998) (20 year gap in time between past acts and instant offense did not mitigate the seriousness of defendant's criminal history where defendant was incarcerated or on probation for most of that 20 year period).  Accordingly, any request for a downward departure based on the argument that the defendant's criminal history over represents his prior criminal conduct should be denied.  See PSR First Addendum.

C. **Self-Defense, Necessity or Justification**

If the defendant seeks a downward departure from the guidelines range based upon an argument asserting self-defense, necessity, and/or justification, such motion should be denied. These grounds -- in certain exceptional cases -- may sometimes support an affirmative defense to the charges to which this defendant pleaded guilty.  To raise these grounds in the context of a motion for downward departure following a guilty plea, however,

10

would refute and negate the defendant's acceptance of responsibility. To the extent that the defendant raises these grounds to support a downward departure at sentencing, such motion should be denied. Moreover, to the extent that he raises these grounds at sentencing, this Court should not award the defendant points for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. In raising any of these grounds, the defendant refutes any acceptance of responsibility for the conduct to which he pleaded guilty. See U.S.S.G. § 3E1.1 applic. n.3 (stating that the entry of a guilty plea "may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility. A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right.")

The self-defense, necessity, and/or justification defense to a § 922(g) charge concerns an exception to a very restrictive statute that, on its face, forbids possession in all circumstances. United States v. Dodd, 225 F.3d 340, 350 (3d Cir. 2000).[2]  The

---

[2] Although the language in § 922(g) gives no hint of an affirmative defense, courts have explained that Congress enacts criminal statutes "against a background of Anglo-Saxon common law." United States v. Bailey, 444 U.S. 394, 415 n.11 (1980). As the Sixth Circuit explained, "common sense dictates that if a previously convicted felon is attacked by someone with a gun, the felon should not be found guilty for taking the gun away from the attacker in order to save his life." United States v. Singleton, 902 F.2d 471, 472 (6th Cir. 1990). These courts state, however, that the defense may arise only in rare situations, and should be construed very narrowly. See United States v. Paolello, 951 F.2d 537, 542 (3d Cir. 1991); United States v. Deleveaux, 205 F.3d 1292, 1297 (11th Cir. 2000) (agreeing with other circuits that defense

defendant must prove such a defense by a preponderance of the evidence, <u>Dodd</u>, 225 F.3d at 345-50, and the law is well settled regarding the elements that a defendant must meet to establish such a defense. <u>See</u> <u>United States v. Paolello</u>, 951 F.2d 537, 540-41 (3d Cir. 1991). The defendant must show that: (1) he was under unlawful and present threat of death or serious bodily injury; (2) he did not recklessly place himself in a situation where he would be forced to engage in criminal conduct; (3) he had no reasonable legal alternative to both the criminal act and the avoidance of the threatened harm; and (4) there was a direct causal relationship between the criminal action and the avoidance of the threatened harm. <u>See</u> <u>id</u>. (citations omitted).

Because the defendant could not meet his burden to establish these elements, he pleaded guilty. He cannot now raise a failed defense to the instant charges under the guise of a motion for downward departure. To the extent that he raises such an argument during sentencing, he does not accept responsibility, and this Court should not award him points for acceptance.

By pleading guilty, the defendant acknowledged that he

---

available "in only extraordinary circumstances"). An example of such extraordinary circumstances may be found in <u>United States v. Gomez</u>, 92 F.3d 770 (9th Cir. 1996), where the defendant, a confidential informant in an investigation of the solicitation of murder of witnesses against a narcotics conspirator, had repeatedly and unsuccessfully sought protection from the authorities after receiving death threats after his name was disclosed in the indictment against the conspirator.

was not under any imminent and impending threat of death or serious bodily injury when he fired his shotgun at the backs of individuals who were fleeing from his home.  <u>See</u> PSR First Addendum.  During his plea colloquy, the defendant admitted that he engaged in criminal conduct by possessing four firearms in his home.  He was not forced to engage in this criminal conduct, and, in pleading guilty, he did not argue otherwise.  Obviously, there are legal alternatives to possessing firearms and taking the law into one's own hands -- such as calling the police and asking for help.  In fact, in this case, the defendant's girlfriend called 911, causing the intruders to flee before the defendant fired one of his firearms into the woods after them.  <u>See</u> PSR First Addendum.

    To permit the defendant to argue now, at sentencing, that his possession of firearms was not wrong, but was, instead, "justified," "necessary," or in "self defense," or somehow avoided some greater harm, allows the defendant to negate his guilty plea and refute any acceptance of responsibility.  He cannot raise these defenses in a motion for downward departure, while, at the same time, purporting to accept responsibility for possessing firearms.  He simply cannot have it both ways.  And, to agree with the defendant's position is to sanction any convicted felon who possesses firearms: after all, an ex-con never knows when his home might be intruded upon.

    Furthermore, the government notes that the case law cited

in the defendant's April 18, 2006 letter ("Letter") to the
Probation Office is entirely inapposite. <u>See</u> PSR First Addendum at
5-6; Letter at 6-7 (discussing "lesser harm"). The defendant did
not possess four firearms over the course of 12 years "without
impropriety": he was in violation of both state and federal law
throughout that time period. He simply did not get caught until
February 2005.

        D.    **Reliance on Consent Agreement**

      In June 1994, a consent agreement, signed by the
defendant, was entered in a civil action, docketed at 1659 MISC
1993, in the Court of Common Pleas of Erie County, Pennsylvania,
attached hereto as Ex. 1. Pursuant to the terms of the agreement,
one of the four firearms listed in the instant federal Indictment,
specifically the Winchester model 1300 12-gauge shotgun, was
returned to the defendant, following his state conviction for
various drug violations. <u>See</u> Ex. 1, ¶4.

      The defendant cannot rely on this consent agreement to
support a motion for downward departure and an assertion that he
unwittingly violated federal law by possessing the Winchester
shotgun, along with three additional firearms. In this regard, the
defendant conveniently forgets that although one Winchester 12
Gauge #L2290391 was returned to him as part of the civil consent
agreement he references, he was required to surrender both a Glock
10 mm #VM886, as well as an Omega Stun gun #919005 as part of that

order.

As this Court is aware, federal law prohibits convicted felons, like the defendant, from possessing firearms. Caron v. United States, 524 U.S. 308, 309 (1998) (citing 18 U.S.C. §922(g)(1)). Such has been the state of the law since at least the year that the defendant was born: section 922(g) originated from two statutes enacted by Congress in 1968, the Omnibus Crime Control and Safe Streets Act, and the Gun Control Act, which established two separate prohibitions on felons possessing firearms, 18 U.S.C. App. § 1202(a)(1) and 18 U.S.C. § 922(h) (1968).

But, before 1995, a convicted felon like the defendant might not have violated Pennsylvania state law by possessing a weapon such as the longer barreled Winchester model 1300 12-gauge shotgun that was returned to him pursuant to the consent agreement. This is because, before 1995, Pennsylvania did not prohibit the possession of longer barreled firearms, such as hunting rifles or shotguns, although it did prohibit the possession of other firearms, such as shorter pistols or concealable weapons. See Commonwealth v. Todd, 384 A.2d 1215 (Pa. 1978) (citing 18 Pa. C.S.A. § 6102 and finding that barrel length is an essential element of state statute proscribing the possession of firearms).

In 1995, Pennsylvania law changed. See Commonwealth v. Gillespie, 821 A.2d 1221, 1224 (Pa. 2003). Since 1995,

Pennsylvania law has been in conformity with federal law, prohibiting convicted felons, like the defendant, from possessing firearms regardless of their barrel length. In Gillespie, the Pennsylvania Supreme Court, noting that the purpose of prohibiting convicted felons from possessing firearms was to protect the public, affirmed the conviction of a defendant who possessed a 12-gauge shot gun with a 24 inch barrel. Id. at 1225.

In the instant case, one of the four firearms that the defendant possessed was a longer barreled 12-gauge shot gun. In June 1994, before the 1995 change in Pennsylvania law, this shotgun was returned to the defendant, pursuant to the civil consent agreement, following his state conviction for drug violations.

This Court should not grant any downward departure based upon any assertion by the defendant that he relied on the civil consent agreement, or pre-1995 Pennsylvania law, to support a mistaken belief that he could possess not only the shotgun, but also three additional firearms. To the extent that the defendant raises this ground, he fails to accept responsibility and should not receive points for acceptance.

Incidentally, the government notes that, following the 1995 change in Pennsylvania law, the defendant was in violation of not only federal law but also state law by continuing to possess the 12-gauge shotgun, which he failed to sell or transfer. 18 Pa. C.S.A. § 6105(a)(2).

16

Moreover, although the consent order returned the longer barreled shotgun to the defendant, it also precluded the return of, *inter alia*, a Glock 10 mm firearm, to him. The defendant forfeited this pistol to the Commonwealth. Ex. 1, ¶4.

The defendant should not be heard to assert his ignorance of federal or state law, or his supposedly unsophisticated misinterpretation of the consent agreement, to support a motion for downward departure. This is particularly true where, as here, the defendant knew that although his shotgun was returned to him in 1994 pursuant to the civil consent agreement, that same agreement forfeited his Glock 10 mm pistol to the Commonwealth. Any motion for downward departure based upon the defendant's ignorance of the law or misunderstanding of the civil consent agreement, should be denied. Moreover, to the extent that the defendant chooses to raise these arguments before this Court at sentencing, the defendant should receive no points for acceptance of responsibility in this case.

## E. Entrapment by Estoppel

This Court should also preclude the defendant from arguing that he was, in any way, "entrapped" by the consent agreement to possess firearms in violation of federal law. As noted above, pursuant to the consent agreement, the defendant forfeited a Glock 10 mm firearm, but his Winchester model 1300 12-gauge shotgun was returned to him following his state conviction

for drug violations.

As a matter of law, the defendant could not meet his burden to establish the defense of "entrapment by estoppel" based on the actions of the court, or his counsel, in entering into the consent agreement.  Accordingly, he pleaded guilty.

To prove the defense of entrapment by estoppel, the defendant would have had to show that: 1) a government agent announced that the charged conduct was legal; 2) the defendant relied on the agent's announcement; 3) the defendant's reliance was reasonable; and 4) given the defendant's reliance, prosecution would be unfair.  See United Sates v. Morgan, 216 F.3d 557, 567 (6th Cir. 2000).

In the typical assertion of the entrapment by estoppel defense, the defendant claims the advice was given by an ATF agent or other federal employee.  See, e.g., Morgan, 216 F.3d at 566. For example, in United States v. Thompson, 25 F.3d 1558 (11th Cir. 1994), the defendant, an occasional source for investigators, claimed that assurances by law enforcement officers that he was permitted to possess firearms despite his status as a convicted felon led him to violate § 922(g)(1).  Although acknowledging that a defendant's motive or intent is generally irrelevant in strict liability crimes such as felon in possession, id. at 1563, the Eleventh Circuit held that, since entrapment by estoppel "focuses on the conduct of the government officials, not on the state of

18

mind of the defendant, . . . [it] is a viable defense in § 922 cases." Id. at 1564.

However, not just anyone may properly be designated as a "government agent" for purposes of an entrapment defense. See United States v. Billue, 994 F.2d 1562, 1569 (11th Cir. 1993) (holding that a "federal license to sell firearms does not transform private licensees into government officials, thereby creating a potential entrapment by estoppel defense"); United States v. Austin, 915 F.2d 363, 366-67 (8th Cir. 1990).

In United States v. Bruscantini, 761 F.2d 640, 641 (11th Cir. 1985), the defendant claimed that both the state judge, who accepted his plea of nolo contendere, and the state prosecutor told him that he was not a convicted felon. He raised an estoppel defense to a subsequent federal prosecution for unlawful possession of a firearm. The court held that the defendant was not insulated from the federal prosecution, because the government officials who advised him were not part of the government that was later prosecuting him. Id. at 642. See also United States v. Powell, 513 F.2d 1249, 1250-51 (8th Cir. 1975) (advice of counsel is no defense to a prosecution under § 1202(a)(1)).

In the instant case, there was no evidence that Judge Domitrovich, who signed the civil consent agreement, acted as a "government agent." See Bruscantini, 761 F.2d at 642. And, clearly, the defendant's counsel in the prior civil action did not

19

act as a government agent. See Powell, 513 F.2d at 1250-51. Moreover, there is no evidence whatsoever that Judge Domitrovich ever announced or affirmatively advised the defendant that he could possess firearms, in violation of federal law, for hunting or otherwise. The defendant could not have reasonably understood Judge Domitrovich's signature on the civil consent order in the Erie County Court of Common Pleas as suggesting anything about the application of federal firearms laws. See United States v. Hardridge, 379 F.3d 1188, 1195 (10th Cir. 2004) (Defense of entrapment by estoppel requires an active misleading by a government agent, and the government agent must be one who is responsible for interpreting, administering, or enforcing the law defining the offense.) To the contrary, Judge Domitrovich merely signed off on the parties' agreement -- which also required the defendant to surrender his 10 mm Glock to the Commonwealth.

And, although it may be true that, before 1995, Pennsylvania permitted ex-convicts like the defendant to possess some longer barreled firearms, such as the shotgun that the Commonwealth returned to the defendant, federal law reflects Congress's belief that existing state laws failed to keep guns away from offenders, like the defendant, who might cause harm, and Congress's interest in a single, national protective policy broader than that required by state law. Caron, 524 U.S. at 315-16.

Moreover, since 1995, Pennsylvania law has been in

20

conformity with federal law. Accordingly, by possessing the firearms listed in the Indictment, the defendant was in violation of both state, and federal, law. Any purported reliance on a 1994 civil consent agreement to possess, in 2005, not only a shotgun listed in the agreement, but also three additional firearms including two pistols, is completely absurd.

Federal law has consistently prohibited the defendant from possessing any one of the firearms listed in the indictment -- including the firearm that was returned to him under the terms of the Pennsylvania civil consent agreement. It is federal policy that governs. Caron, 524 U.S. at 316. Finally, the state limitation forbidding the defendant from possessing one or more types of firearms "activate[d] the uniform federal ban on possessing any firearms at all. This is so even if the guns the offender possessed were ones the State permitted him to have." Id. at 315.

In sum, by possessing four firearms, the defendant was in violation of both federal and state law. Just as ignorance of the law is no defense, neither is ignorance a ground for a downward departure. Any downward departure, based upon the defendant's reliance on the consent agreement, equitable estoppel, or lack of sophistication, is not warranted. To the extent that the defendant pursues these grounds at sentencing, he negates his acceptance of responsibility, and points for acceptance should not be awarded to

21

the defendant.

**F.    Lack of Sophistication and/or Intent**

The mens rea of knowingly applies to the <u>possession of the firearm</u>; it does not require that the defendant knew the conduct was illegal.  <u>See</u>, <u>e.g.</u>, <u>United States v. Beavers</u>, 206 F.3d 706, 708 (6th Cir. 2000)("'knowingly' only requires that the accused know that he possessed a firearm, not that he knew that such possession was illegal") (citing <u>United States v. Bostic</u>, 168 F.3d 718, 722-23 (4th Cir. 1999) and <u>United States v. Capps</u>, 77 F.3d 350, 352 (10th Cir. 1996)).  Thus, the term "knowingly" means that the defendant was conscious and aware of his action, realized what he was doing, and did not act because of ignorance, mistake or accident.  The requirement that the government must show that the defendant "knowingly possessed a firearm" means that the government must prove the defendant's awareness that he <u>possessed the firearm</u>; the government need not prove that the defendant possessed the firearm with an intent to cause harm, or with knowledge that such possession was unlawful.  <u>United States v. Dodd</u>, 225 F.3d 340, 344 (3d Cir. 2000).  Because the defendant knowingly possessed four weapons, he pleaded guilty.

In fact, as the defendant could neither possess nor purchase weapons, the PSR shows that defendant appears to have arranged for others to obtain weapons on his behalf, sometimes in exchange for drugs.  The Rugar semiautomatic rifle was purchased

22

for the defendant in 1994 by his wife; the Cobray 9 mm pistol in the defendant's possession was purchased in 1999 by Robert Brandt; and the Beretta semiautomatic pistol was purchased for the defendant by Frank DiGello in 2002, in partial repayment of a drug debt (PSR ¶¶ 9, 10, 11).

The defendant cannot now plausibly rely on his purported "ignorance of the law" or his "lack of sophistication or intent" (Factor No. 5), to excuse his possession of firearms. See United States v. Mason, 233 F.3d 619, 624-25 (D.C. Cir. 2000) ("innocent possession" defense to a § 922(g)(1) charge is "necessarily narrow," and "focuses precisely on how the defendant came into possession of the gun, the length of time of possession, and the manner in which the defendant acts to rid himself of possession"). As the Probation Office concluded, a downward departure based upon the defendant's alleged ignorance or lack of sophistication is not warranted and should not be granted.[3]

### G.   **Family Circumstances**

Should the defendant seek a downward departure based on his family circumstances, such motion should be denied.

Family ties and responsibilities are not ordinarily relevant in determining whether a sentence should be outside the

---

[3] Incidentally, although the defendant's firearms need not have been operable to support a conviction, United States v. Yannott, 42 F.3d 999, 1006 (6th Cir. 1994), at least three of the defendant's firearms were operable.

23

applicable guideline range.  U.S.S.G. § 5H1.6.  See also, United States v. Sweeting, 213 F.3d 95, 99 (3d Cir. 2000) (recognizing that the Sentencing Commission specifically has identified family ties and responsibilities as "not ordinarily relevant" in determining a defendant's sentence).

Thus, the Sentencing Commission has classified family ties and responsibilities as a "discouraged" basis for departure. Sweeting, 213 F.3d at 99 (citing Koon v. United States, 518 U.S. 81 (1996)).  While discouraged factors are not necessarily inappropriate bases for departure, they nevertheless are factors that should be relied upon only in exceptional cases.  Id.  Thus, the Third Circuit has concluded that a downward departure based on family ties and responsibilities should be the exception rather than the rule.  Sweeting, 213 F.3d at 100 (citations omitted).

In the instant case, the defendant's son, D.A., has autoimmune hepatitis, PSR ¶ 43, and the defendant may argue that this diagnoses presents an extraordinary family circumstance warranting a downward departure.  However, the PSR reflects that D.A.'s hepatitis may -- or may not -- require him to undergo a liver transplant at some future point (PSR ¶43).[4]  D.A. is presently seen monthly by a local physician, and semi-annually by

_____

[4] D.A. also takes prescriptions for Amoxicillin, which treats bacterial infections,  Famotidine, which inhibits stomach acid production, and Azathioprine, an immunosuppressant.  See PSR ¶43; see also http://en.wikipedia.org.

a physician in Pittsburgh (PSR ¶43).  D.A. attends school regularly, and, although he has missed some classes, his hepatitis is presently well managed, and nothing suggests that it will not continue to be so (PSR ¶43, PSR Second Addendum).

In this regard, the PSR and the Office of Children and Youth recognize that there are a number of responsible adults who can care for D.A., and take him to his monthly medical appointments, while the defendant is incarcerated.  These individuals include D.A.'s maternal grandmother, Sarah Ently, as well as his paternal grandparents and four aunts, all of whom live in Erie.  See PSR ¶38, 39; PSR Second Addendum.  These adults have expressed their ability and willingness to care for D.A., provide him with any necessary attention, and take him to his monthly medical appointments, during the period of the defendant's incarceration.  See PSR Second Addendum.

The government also notes that the defendant's parents, Leon F. Akerly, I, and Rhea Akerly, who reside in Erie and have maintained close contact with both D.A. and his sister over the years, have been the primary financial support for the defendant and his children and will continue to support the defendant's children.  See PSR Second Addendum.  D.A.'s grandparents employed the defendant, pay his bills, and own the home in which defendant lived, rent-free, with D.A. and D.A.'s sister (PSR ¶67).

A downward departure cannot be justified based on

Akerly's employment or his family ties and responsibilities because the facts presented are neither so exceptional nor so extraordinary as to warrant such a departure. See Sweeting, 213 F.3d at 99 (reversing downward departure, as facts were not exceptional, where the defendant was a single mother and sole provider for five children, one of whom had a substantial neurological deficit in the form of Tourette's Syndrome).

In Sweeting, the Third Circuit examined when a downward departure was appropriate under Section 5H1.6, due to a defendant's extraordinary family ties and responsibilities. The district court in Sweeting granted a departure from the Sentencing Guidelines where the defendant was a single mother and sole provider for five children, one of whom had a substantial neurological deficit in the form of Tourette's Syndrome. See 213 F.3d at 97-98. The Third Circuit reversed, noting that family ties and responsibilities are "not ordinarily relevant" in determining an offender's sentence and that sentencing departures based on the existence of such ties and responsibilities are "discouraged" and should occur "only in exceptional cases." Id. at 99 (citations and internal quotations omitted).

Sweeting recognized that the circumstance of the incarceration of a single parent "cannot be considered atypical, inasmuch as innumerable defendants no doubt could establish that their absence will cause a void in their children's lives."

26

Sweeting, 213 F.3d at 102.  Moreover, Sweeting expressly rejected the argument that departure is warranted where a defendant is a good parent or has a substantial positive influence on his or her children's lives.  See id. (citation omitted).

The pivotal factor in Sweeting, and the only factor that could have arguably removed that case from the heartland of cases under the Guidelines, was the fact that Sweeting's oldest son suffered from Tourette's Syndrome.  See id. at 104.  The Third Circuit noted that such a medical problem, however, "cannot be viewed in a vacuum" and that courts "must weigh carefully, among other things, the severity of the condition and the degree of extra attention that it requires." Id. at 107 (citation omitted).  The Third Circuit was unpersuaded by Sweeting's argument that her son's condition presented an extraordinary case warranting a downward departure.  It noted that nothing in the record indicated that Sweeting was "irreplaceable" and that nothing suggested that the type of care which her son required was "so unique or burdensome that another responsible adult could not provide the necessary supervision and assistance in Sweeting's absence." Id. at 104-05.

Likewise, nothing in the record in the instant case indicates that the defendant is indispensable.  Although D.A. has been diagnosed with hepatitis, there is no evidence that D.A.'s needs are so unique or extensive that another responsible adult could not perform the defendant's role during the period of his

incarceration. There is no indication that D.A.'s condition is so severe that it precludes him from participating meaningfully in school or activities. As to his needs, the PSR shows only that D.A. should visit his physician for routine monthly and semi-annual check-ups. There is nothing in the record to suggest that the defendant's role could not be filled by another responsible adult. As in Sweeting, although D.A. may require additional attention and care, there is nothing so extraordinary about the nature or severity of his condition, the prescribed method of treatment, or the type of assistance that the defendant provides which compels the conclusion that the defendant is indispensable, or that no other competent adult could provide D.A. with the care and attention he needs. As the Third Circuit has observed, the fact that a child "needs one-on-one guidance does not lead to the conclusion that [the appellant] is the **only** person capable of providing it. Moreover, to the extent that . . . [the appellant] is a positive influence on her [child's] life . . . the circumstance is not the atypical or extraordinary situation warranting a departure." Sweeting, 213 F.3d at 109.

       In sum, there is nothing "extraordinary" about the defendant's family responsibilities that would justify a downward departure, see Sweeting, 213 F.3d at 100-01. Nothing in the record indicates that Akerly is "irreplaceable" or that the type of care D.A. requires is "so unique or burdensome that another responsible

28

adult could not provide the necessary supervision and assistance in [the defendant's] absence." See id. at 104-05. That the defendant's imprisonment will impact his family is a consequence of his criminal conviction, and is common to others in similar situations. However, Akerly's family responsibilities do not make this case special or unusual such that a downward departure is justified. Therefore, the government submits that any request for a downward departure for extraordinary family responsibilities should be denied.[5]

### H.  Other Grounds/Unidentified Circumstances

Finally, the government notes that section 5K2.0 of the Sentencing Guidelines sets forth the Sentencing Commission's policy statement with respect to grounds for departure and provides that a court may depart from the applicable guideline range if there is a mitigating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." U.S.S.G. §5K2.0 (2004). There are no circumstances warranting such a downward departure here. United States v. Monaco, 23 F.3d 793 (3d Cir. 1994); United States v. Himelright, 42 F.3d at 777 (3d Cir. 1994)).

---

[5] Incidentally, a question remains as to whether the best interest of a child may be truly served by allowing him to remain under the care of a defendant who possessed firearms and engaged in the sale of narcotics. See Sweeting, 213 F.3d at 111 (citation omitted). It is worth repeating that, in addition to his past drug related conviction, current state charges for drug distribution are now pending against the defendant. See PSR Second Addendum.

Referring to a §5K2.20 departure in <u>Stuart</u>, the court noted that the United States Sentencing Commission Guidelines Manual stated that "when an atypical case falls outside the 'heartland' in that 'a particular guideline linguistically applies but . . . the conduct significantly differs from the norm,' the court may consider whether a departure is warranted." <u>United States v. Stuart</u>, 22 F.3d 76, 82-83 (3d Cir. 1994).

However, in making this evaluation, the sentencing court should first apply other relevant guidelines by analogy:

> When departing on the basis of offense characteristics, the sentencing court should extend or extrapolate from other Guideline levels or principles, or employ analogies to closely related circumstances or conduct addressed by the Guidelines.  In effect, the court predicts what level of punishment the Sentencing Commission would have assigned to the offense had it been considered in the formulation of the Guidelines.

<u>Stuart</u>, 22 F.3d at 83 (citing <u>United States v. Bierly</u>, 922 F.2d 1061, 1069 (3d Cir. 1990); <u>United States v. Strickland</u>, 941 F.2d 1047, 1051 (10th Cir. 1991).

Reading the First Addendum, it becomes apparent that the defendant neither cited this section of the guidelines as a basis for a downward departure nor referenced any other relevant guideline to which this Court can analogize, a step that is required by <u>Stuart</u>.  Rather, the defendant apparently merely offered up several alleged post-offense characteristics which supposedly render his conduct benign, including his employment

history, care of his children, and purported lack of sophistication. As discussed above, these characteristics, even if accurate, are not ones that are typically considered by other guidelines as a reason for departing downward.

And, as he must concede, a defendant's employment record is a discouraged factor which is not ordinarily relevant in determining whether a departure is warranted. U.S.S.G. §5H1.5 (2004). Discouraged factors are to be used as a basis for departure only in exceptional cases. Koon v. United States, 518 U.S. 81, 96 (1996). Thus, in an unusual situation, a defendant's employment history might provide a basis for downward departure, but such circumstances are extremely infrequent, and are certainly not present here. United States v. Ogembe, 41 F.Supp.2d 567, 570 (E.D. Pa. 1999) (citing United States v. Higgins, 967 F.2d 841, 845-46 (3d Cir. 1992)). The defendant has provided no explanation as to why his work history should qualify him for a downward departure, and, as the Probation Office noted, the defendant has neither been the sole financial provider, nor the sole caregiver, of his children for the past several years. Accordingly, any request for a downward departure based on the defendant's post-offense employment or conduct should be denied.

In fact, the defendant's post-offense conduct warrants an upward departure. The defendant violated a condition of his bond; marijuana, a scale, and cash have been found in his home; and he

31

has been charged by the state with possession with intent to distribute marijuana. The government notes that departures have been affirmed when reliable evidence indicated that a defendant continued to commit unlawful acts after arrest or conviction on the current offense but before sentencing, on the ground that this additional criminal conduct is not included in the criminal history score but should be accounted for. See, e.g., U.S. v. Myers, 41 F.3d 531, 533-34 (9th Cir. 1994); U.S. v. Fahm, 13 F.3d 447, 451 (1st Cir. 1994); U.S. v. Keats, 937 F.2d 58, 66-67 (2d Cir. 1991); U.S. v. George, 911 F.2d 1028, 1030-31 (5th Cir. 1990); U.S. v. Franklin, 902 F.2d 501, 506 (7th Cir. 1990) (continued drug use or dealing while on bond); U.S. v. Fayette, 895 F.2d 1375, 1379-80 (11th Cir. 1990) (post-plea criminal conduct); U.S. v. Sanchez, 893 F.2d 679, 681 (5th Cir. 1990) (continued unlawful conduct while on pretrial release); U.S. v. White, 893 F.2d 276, 279-80 (10th Cir. 1990); U.S. v. Geiger, 891 F.2d 512, 513-14 (5th Cir. 1989) (same); U.S. v. Jordan, 890 F.2d 968, 976-77 (7th Cir. 1989) (continued use of and dealing in drugs).

In sum, the government disputes the accuracy of the offense characteristics as set forth by the defendant in his objections to the PSR and disagrees that these factors somehow differentiate the defendant from other felons found guilty of possessing firearms so as to warrant a downward departure. There simply is nothing about the defendant's behavior which takes this

case outside the heartland of other felon-in-possession cases. Therefore, the government submits that there is no basis supporting a downward departure. To the contrary, the defendant's post-offense conduct and the new charges against him establish grounds for an upward departure. And, to the extent that the defendant refutes his acceptance of responsibility during sentencing by asserting self-defense, justification, necessity, entrapment, or reliance, *inter alia*, this Court should not award the defendant any points for acceptance of responsibility. <u>See</u> U.S.S.G. § 3E1.1.


III.    <u>**CONCLUSION**</u>

        WHEREFORE, for all of the foregoing reasons, a motion for downward departure based on any of the foregoing grounds should be denied, an adjustment for acceptance of responsibility should be denied, and an upward departure should be granted.

                          Respectfully submitted,

                          MARY BETH BUCHANAN
                          United States Attorney


                          s/Christine A. Sanner
                          CHRISTINE A. SANNER
                          Assistant U.S. Attorney
                          PA ID No. 85039