IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.  05-25 Erie |
| | ) | (18 U.S.C. §§922(g)(1) |
| LEON F. AKERLY, II | ) | (Electronically Filed) |

## LEON F. AKERLY, II'S SENTENCING MEMORANDUM

### I.    INTRODUCTION

On April 18, 2006, the defendant filed his Objections to the Presentence Investigative Report prepared by Probation Officer David Conde.  The defendant incorporates by reference thereto all of those objections and provides the following additional information which either individually or collectively justify a downward departure from the applicable Sentencing Guideline range to a sentence of community confinement.  The grounds for departure are individually and collectively:

1.  Mr. Akerly's good faith belief, although not a legal defense, and the circumstances surrounding the possession of the firearms in question are unique and justify a departure pursuant to U.S.S.G. §5K2.0;

2.  Mr. Akerly's conduct in defending his life, his son and his girlfriend as well as his property justify a departure pursuant to U.S.S.G. §5K2.1;

3.  Mr. Akerly's unusual family circumstances including, but not limited to, the critical illness of his 10 year old son, the needs of his 12 year old daughter, particularly in light of the recent murder of their mother and the importance of

Mr. Akerly maintaining the family business justify a departure pursuant to

U.S.S.G. §5H1.6;

4.      Mr. Akerly's criminal history score of 6 placing him in Criminal History

Category III significantly over-represents his criminal history;

## II.    FACTS

On February 28, 2005, shortly after 10:00 a.m., five masked intruders entered the

basement area of Mr. Akerly's residence.  They proceeded to beat him senselessly with a

baseball bat and other implements.  Mr. Akerly sustained serious lacerations and contusions to

his head, shoulders, and back necessitating transportation via ambulance to Hamot Medical

Center for immediate medical attention.  Somehow during this brutal attack and assault, Mr.

Akerly was able to direct his girlfriend, Jessie Spencer, to call 911 for State Police assistance.

His then nine-year-old son, Damon, was in the residence at the time of the home invasion and

assault.  The specific facts are as follows:

Leon's ten-year-old son, Damon, suffers from an extremely serious disease called

autoimmune hepatitis.[1]  As a result of this disease, Damon was home sick and Leon, rather than

going to work, placed several calls to Peter Wilczanski, M.D., their family doctor, for advice as

to whether he should be brought in or taken to Children's Hospital in Pittsburgh where he has

been treated for the past several years.  As Leon sat in his desk chair in front of the desk and

hutch area waiting for a return call from the doctor's office, he dozed off.  The next thing he

knew there were at least three to four masked intruders in his basement with the biggest

individual placing him in a headlock and hitting him on the top of his head with a baseball bat.

Several of the other individuals began to kick, punch, and hit Leon.  Leon struggled for his life

---

[1] The facts and medical history surrounding Damon's condition is discussed fully in Part IV, Sec. 3, *infra*.

while the attackers ransacked his basement. He believes he may have been calling his girlfriend,

Jessie Spencer, for help. He does recall that Jessie and his son, Damon, did come downstairs and

saw what was going on and turned and ran back upstairs. He yelled to Jessie to call 911 for State

Police assistance. Several of the attackers attempted to leave the basement area and go to the

first floor to prevent Jessie from calling 911. Doors were smashed in their attempts to reach her

and his son who was hiding in the bathroom on the first floor. The assailants then left and Leon

was able to go up to the first floor and retrieve a 12 gauge shotgun which he discharged several

times to let the assailants know that he had a firearm and to prevent their return into the residence

while they awaited emergency State Police and medical assistance.

After the State Police arrived, they took photographs of the residence as well as

photographs of Leon at Hamot Medical Center to document the severity of his head injuries and

trauma to his shoulders, back, and legs. The following photographic exhibits were obtained from

the Pennsylvania State Police pursuant to subpoena and clearly demonstrate the devastation done

to the basement area and the life-threatening injuries sustained by Leon and the severity of the

assault. See Exhibits 1 through 16 (basement, 1st floor and head injuries).

Leon does not remember all of the conversations that he had with the State Police. He

does remember being transported to Hamot Medical Center via ambulance. At Hamot he was

quickly examined by the emergency room physician, a morphine drip was initiated for the

intense pain, the head and facial wounds were cleaned and sutured and then he was wheeled on a

gurney to the radiology department for a CT scan and subsequent MRI. The wounds to his head

as reflected in Exhibits 9-10 required over 40 sutures to close. Fortunately, the brutal beating did

not cause any hemorrhaging in his brain and he was released late that evening. The baseball bat

that was used to beat Leon about his head and body was recovered. The bat is an aluminum

baseball bat drilled and filled with lead. This bat as modified is an extremely dangerous weapon, designed for only one purpose which is to inflict serious bodily injury on another or cause death. The bat will be available at the sentencing hearing for the Court's inspection.

When the State Police entered the house, they first secured the residence to make sure that none of the assailants were hiding therein. Thereafter, several State Police officers proceeded to follow footprints in the snow to a line of trees. Eventually, five adult assailants were apprehended and one juvenile in a car used by the assailants to drive to an area near the residence. State Police Photo Exhibits 17 & 18 shows that the assailants had a shotgun in the trunk of the car and several other implements that are also deadly weapons.

When the State Police entered the residence, the 12 gauge shotgun that Leon had fired several times out the back door leading to the rear deck was positioned in the kitchen in plain view. Leon partially recalls informing the State Police officer that he had discharged the weapon and had used birdshot. Also in plain view was the Ruger model 10/22 Carbine 22 caliber rifle on top of a counter area in the kitchen. Leon does not remember being asked for permission to search the residence. However, due to his condition, it is possible that he did refuse permission. After Leon was transported to the medical center, the State Police obtained a search warrant to search his residence as a crime scene identifying the crimes under investigation as robbery, burglary, and aggravated assault. A copy of the search warrant issued on February 28, 2005 is attached and marked as Exhibit 19. This search produced a .22 caliber Beretta in a briefcase on a rack or hutch in the basement area where the assault occurred. On the first floor the State Police found a SWD Cobray model M-11 9 mm. pistol in the upstairs closet in a gun case. No drugs or drug paraphernalia was found in the residence.

Subsequently, the State Police filed charges against the adult assailants and a Petition for Delinquency in the Juvenile Court of Erie County against the sole juvenile. As a result, Leon was required to attend several preliminary hearings as a Commonwealth witness before District Judge Frank Abate in North East, Pennsylvania.

As a result of the State Police investigation and subsequent prosecution, the following individuals were convicted and received the following sentences:

1.    **Michael Joseph Chiaramonte**

| | |
|---|---|
| Charges: | Aggravated Assault, burglary, robbery-inflict serious bodily injury, conspiracy-burglary, conspiracy-robbery-inflict serious bodily injury, corruption of minors, possessing instrument of crime, and simple assault |
| Plea: | Guilty plea on 10/31/05 to burglary and conspiracy-robbery-inflict serious bodily injury |
| Docket: | 969 of 2005 (Erie County) |
| Date of Sentence: | 01/09/06 |
| Sentencing Judge: | Honorable John J. Trucilla |
| Sentence Imposed: | 66 to 144 months incarceration and 10 years probation, costs and restitution |

2.    **Timothy James Rainey**

| | |
|---|---|
| Charges: | Conspiracy-robbery, conspiracy-burglary, and corruption of minors |
| Plea: | Guilty plea on 03/09/06 to conspiracy-burglary |
| Docket: | 843 of 2005 (Erie County) |
| Date of Sentence: | 04/20/06 |
| Sentencing Judge: | Honorable John J. Trucilla |
| Sentence Imposed: | 12 to 30 months incarceration and 10 years probation and costs |

3.    **Wesley Rucker, Jr.**

| | |
|---|---|
| Charges: | Aggravated Assault, burglary, robbery-inflict serious bodily injury, conspiracy-burglary, conspiracy-robbery-inflict serious bodily injury, corruption of minors, possessing instrument of crime, and simple assault |
| Plea: | Guilty plea on 06/30/05 to burglary and conspiracy-robbery-inflict serious bodily injury |
| Docket: | 844 of 2005 (Erie County) |
| Date of Sentence: | 08/18/05 |
| Sentencing Judge: | Honorable John J. Trucilla |
| Sentence Imposed: | 84 months to 180 months incarceration and 10 years |

Probation and costs

4.  **Dameian Scott Ruggles**
    Charges:             Aggravated Assault, burglary, robbery-inflict serious
                         bodily injury, conspiracy-burglary, conspiracy-robbery-
                         inflict serious bodily injury, corruption of minors,
                         possessing instrument of crime, and simple assault
    Plea:                Guilty plea on 10/26/05 to burglary and conspiracy-
                         burglary
    Docket:              968 of 2005 (Erie County)
    Date of Sentence:    12/28/05
    Sentencing Judge:    Honorable John J. Trucilla
    Sentence Imposed:    48 months to 108 months incarceration and 12 years
                         probation, costs

5.  **Hobert Lee Whitt, Jr.**
    Charges:             Aggravated Assault, burglary, robbery-inflict serious
                         bodily injury, conspiracy-burglary, conspiracy-robbery-
                         inflict serious bodily injury, corruption of minors,
                         possessing instrument of crime, and simple assault
    Plea:                Guilty plea on 08/29/05 to burglary and conspiracy-
                         robbery-inflict serious bodily injury
    Docket:              966 of 2005 (Erie County)
    Date of Sentence:    09/12/05
    Sentencing Judge     Honorable John J. Trucilla
    Sentence Imposed:    138 months to 276 months incarceration and costs

6.  The juvenile was processed in the juvenile court system in Erie County. His
    disposition is unavailable.

The sentences imposed by Judge Trucilla of the Court of Common Pleas of Erie County

reflect the extreme seriousness and viciousness of the defendants' attack upon Leon. But for the

grace of God, Leon survived this vicious attack without losing his life and sustaining significant

brain damage.

On June 7, 2005, Leon was charged in a one count indictment with violating 18 U.S.C.

§922(g)(1) by being a convicted felon in possession of the firearms identified herein. On

December 6, 2005, Leon entered a plea of guilty as charged.

## III.    DEFENDANT'S COOPERATION

The defendant and his counsel have freely and fully disclosed much of the information concerning the defendant's pre-offense background to the probation officer as well as information concerning his extraordinary family situation and responsibilities. Specifically, the probation officer was provided with all school records concerning the defendant, the Order of the Court of Common Pleas returning various firearms to Leon following a Stipulation Order entered into between the Pennsylvania Attorney General's Office and his former defense counsel, Donald E. Lewis, Esquire, and approved by Judge Stephanie Domitrovich of the Court of Common Pleas of Erie County on June 10, 1994. Additionally, he provided copies of all of work records, tax returns, etc. Further, various medical records involving his son Damon and his autoimmune hepatitis disease, the school records of his children and all of records from the Court of Common Pleas of Erie County regarding the five adult individuals who committed the home invasion at his residence on February 28, 2005. Much of this material is contained in paragraphs 37 through 71 (PSI pgs. 11-17). His cooperation was consistent with his open and willing acceptance of responsibility.

## IV.    GROUNDS FOR DEPARTURE

**THE FOLLOWING GROUNDS, EITHER INDIVIDUALLY OR COLLECTIVELY, JUSTIFY DOWNWARD DEPARTURE FROM THE APPLICABLE SENTENCING GUIDELINE RANGE TO A SENTENCE OF COMMUNITY CONFINEMENT.**

1.    *Mr. Akerly's good faith belief, although not a legal defense, and the circumstances surrounding the possession of the firearms in question justify a departure pursuant to U.S.S.G. §5K2.0(a)(1).*

7

Section 5K2.0(a)(1) provides that the Court may depart downward if there exists mitigating circumstances of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.

In the Commentary under the heading Application Notes, *circumstance* is defined to include, "as appropriate, *offender characteristic or any other offense factor*." See, Note 1. Further, the Commentary in Note 2 entitled, "Scope of this Policy Statement" states that 5K2.0 covers departures from the applicable guideline range based on offense characteristics or offender characteristics of a kind, or to a degree, not adequately taken into consideration in determining that range. See, 18 U.S.C. §3553(b). As the Presentence Report correctly reflects at paragraph 30 (pgs. 8-9), the defendant was previously convicted of delivery of marijuana and possession with the intent to deliver marijuana and possession of marijuana by way of a plea of guilty on October 20, 1993. At the time of his arrest in 1993 by agents of the Pennsylvania Attorney General's Office, various firearms were seized from his then residence. One of the firearms is the Winchester Model 1300 12 gauge shotgun as charged in the indictment. Additionally, other rifles and a handgun were seized.

The defendant was sentenced on November 29, 1993 to a total of 9 months to 18 months in the Erie County Prison and 54 months probation. He was paroled from the Erie County Prison on June 27, 1994 and completed supervised release uneventfully on November 28, 1999. The Presentence Report does not note the defendant was immediately placed in the Erie County Work Release Program and worked at the family business through the Work Release Program until he was paroled on June 27, 1994.

Previous to his conviction, the defendant, through his then counsel, Donald E. Lewis, Esquire, had filed on September 1, 1993 a claim on behalf of Mr. Akerly seeking the return of

various firearms and related items that were seized from his residence. After the defendant was

sentenced by Judge Connelly on November 29, 1993, Mr. Lewis and Ian Murray, co-counsel for

Mr. Akerly and his late wife, Stacy Watral, negotiated a stipulation on December 21, 1993 for

the return of various firearms to Mr. Akerly. See Exhibit 20 (Petition for Consent Order and

Consent Order dated 06-10-94).

Specifically, the following firearms were returned to Mr. Akerly on 06-10-94:

1.    Winchester 12 gauge shotgun, Serial #L2290391;

2.    Strum & Ruger 5.56 Rifle, Serial #186-13988;

3.    12 gauge rifle, Serial #C946759HL-41;

4.    H & R 12 gauge gun, Serial #AR256410; and

5.    Remington 30.06 gun, Serial #A8050040.

The Winchester 12 gauge shotgun referenced in the Consent Order is the shotgun that

was seized from the defendant's residence on February 28, 2005 which he had discharged to

prevent the assailants from returning to his residence while awaiting for State Police assistance.

The Consent Order also provides that a handgun, currency, and other items would be forfeited to

the Commonwealth of Pennsylvania as part of the stipulated Petition for Consent Order. On

June 10, 1994, the Consent Order was signed by Judge Stephanie Domitrovich of the Court of

Common Pleas of Erie County allowing for the return of the above firearms referenced in

para. 1, pg. 1 of said Order.

Mr. Akerly's former counsel, Donald E. Lewis, Esquire, prior to returning to private

practice in Meadville, Pennsylvania, was an Assistant United States Attorney in the United

States Attorney's Office for the Western District of Pennsylvania from January 1983 through

1986. During that time period, Mr. Lewis prosecuted several felon-in-possession charges

(identical to the charges in this indictment) and undersigned counsel defended these individuals.

Therefore, it is inconceivable that Mr. Lewis would not know or fail to advise Mr. Akerly that

due to his conviction on October 20, 1993 for the sale of marijuana that he was ineligible under

the Federal Firearms Act to possess any type of firearm. Unfortunately, the inconceivable

occurred. Not only did Mr. Lewis negotiate the return of these firearms to the defendant, he

secured a Consent Order from Judge Domitrovich of the Court of Common Pleas which was

provided to the defendant along with the five firearms. Those actions by Mr. Lewis with the

concurrence of the Attorney General of the Commonwealth of Pennsylvania and the imprimatur

of the Court of Common Pleas of Erie County caused Mr. Akerly to be in violation of the

Federal Firearms Act as soon as he executed the receipt and received the firearms from the

Attorney General on June 10, 1994. Mr. Akerly retained Mr. Lewis and paid him for his

services. As such, he was entitled to rely upon not only his advice but his knowledge that Mr.

Lewis was a former federal prosecutor in the Western District of Pennsylvania and would surely

not advance a claim for the return of firearms that upon receipt by him would constitute a

violation of Title 18 U.S.C. §922(g)(1).

The reality is that Mr. Lewis never advised Mr. Akerly that he was ineligible to own,

possess, or use a firearm due to his drug conviction. This is evidenced by the fact that on page 3

of the Petition for Consent Order he executed the document along with co-counsel on behalf of

the defendant and his now deceased wife. Further, the document was executed by Deputy

Attorney General Clarence D. Neish, apparently ignorant of the Federal Firearms Act which

made it a crime for a individual convicted of an offense which has a term of punishment in

excess of one year from possessing, owning, and/or using a firearm. The Federal Firearms Act

was originally enacted in 1968 and modified in 1970 by Congress. It is incomprehensible that a

former federal prosecutor would knowingly advise and assist a client in committing a federal firearms violation. Unfortunately, this is exactly what occurred in Mr. Akerly's case.

Antidotal evidence makes it abundantly clear Mr. Lewis had to know not only from his past employment as an Assistant United States Attorney but from his involvement of representing a co-defendant in the case of *United States v. Patrick DiLoreto*, Criminal No. 88-9 Erie, which was tried for approximately 10 weeks before this Court from the middle of May 1990 through the first week of July 1990. Undersigned counsel represented Mr. DiLoreto who was charged with various drug violations including operating a continuing criminal enterprise, but more importantly, being a previously convicted state drug felon in possession of certain firearms. Mr. Lewis represented a co-defendant and was present when various federal agents testified during the trial that Mr. DiLoreto had a prior state drug conviction which made him ineligible to possess a firearm. Yet, four years later, Mr. Lewis, after having represented Mr. Akerly in a state drug prosecution and witnessing his conviction, arranged for the return of five firearms proscribed by the Federal Firearms Act to Mr. Akerly in violation of said laws. Mr. Akerly asserts that he relied upon Mr. Lewis for competent legal advice to his extreme detriment.

As a result of the misleading legal advice received from Mr. Lewis, Mr. Akerly not only possessed the five firearms returned but used several of them hunting with friends and family members for deer and small game. Four of the firearms were sold and replaced with other firearms. Additionally, when Mr. Akerly was monitored on state probation, he was never advised by his probation officer that it would be a violation of the federal gun laws for him to own, possess, and/or use a firearm. Further, Mr. Akerly had a certified court order signed by Judge Domitrovich of the Court of Common Pleas of Erie County allowing him to possess and/or use one of the firearms in question in this case. Mr. Akerly was advised by Mr. Lewis

11

that when he completed his period of probation on November 28, 1999 that he was then free to possess not only shotguns and rifles but also handguns. Mr. Akerly was advised by Mr. Lewis that the reason the Glock handgun was not returned to him whereas the long guns were was because he was under court supervision. This is the why and how Mr. Akerly came into possession of the two handguns in this case as seized by the State Police on February 28, 2005. Further, both of the handguns in question, i.e., the Cobray Leinard semi-automatic carbine, model CM-11, 9 caliber, 9 mm. pistol and the Beretta semi-automatic pistol, model 21A, caliber 22 long rifle where acquired after the period of supervised release was completed.

In promulgating the guideline range for a violation of 18 U.S.C. §922(g)(1), the Sentencing Commission did not and could not take into consideration a situation as present in the defendant's case. The Sentencing Commission could not envision a situation where a former federal prosecutor would advise and legally assist a convicted felon to procure and possess firearms in violation of the Federal Firearms Act. Nor could the Commission envision a situation where the procurement would have the stamp of judicial approval which would lead the possessor to believe that he had a lawful and legal right to own and possess the firearms in question.

U.S.S.G. §2K2.1 Firearms entitled "*Unlawful* receipt, possession, or transportation of firearms or ammunition, etc." envisions those situations where the person *unlawfully receives*, possesses, and/or uses a firearm. Unbelievably, the facts giving rise to the defendant's possession and belief regarding his ownership, possession, and use of firearms do not provide a legal defense. However, his good faith belief based upon the unique and highly unusual circumstances in this case justify a significant departure. The complicity of his former counsel in the procurement and ultimate return of the five firearms in 1994 including one of the firearms

12

charged in this indictment is not only extraordinarily unusual but is also a significant mitigating factor.

The two handguns charged in the indictment were acquired from individuals, one of whom was Frank Digello. As will be developed in Part V, Mr. Digello is a compulsive liar who has made various false statements to the State Police and ATF agents only to reverse his course when confronted with the fact that his statements were false. The Presentence Report at paragraph 9, page 4, indicates that the Cobray Leinard semi-automatic carbine, Model CM-11, 9-caliber, 9 mm. pistol was purchased on December 2, 1999, by Robert Brandt of Franklin, Pennsylvania. It goes on to note that Mr. Brandt has a prior federal firearms conviction in the Western District of Pennsylvania although it does not indicate whether the conviction was obtained before or after the purchase. Mr. Akerly did not acquire this firearm from Mr. Brandt. Rather, the firearm was left by a friend of his at his house after they completed target shooting in the woods behind his house several months before the home invasion on February 28, 2005.

2.    *Mr. Akerly's conduct in defending his life, his son and his girlfriend as well as his property justify a departure pursuant to U.S.S.G. §5K2.1.*

Certainly, having a weapon, although admittedly unlawful to possess, may have prevented the loss of life. It is clear that the perpetrators fled once Ms. Jessica Spencer initially retrieved the weapon and when Mr. Akerly then used it to frighten off the perpetrators. At that juncture he was severely beaten and in great fear of his life. We speculate as to what the ultimate results may have been had he NOT had the weapon. See, U.S.S.G. §5K2.11 (departure permissible where a defendant commits a crime "to avoid a perceived greater harm.[where] circumstances significantly diminish society's interest in punishing the conduct" or where "conduct may not cause or threaten the harm or evil sought to be prevented by the law").

Obviously, Mr. Akerly was in possession of a firearm for at least 12 years with no improprieties whatsoever. See, e.g. *United States v. Marcello,* 13 F.3d 752 (3rd Cir. 1994); *United States. v. Bayne,* 2004 WL 1488548, 103 Fed. Appx. 710 (4th Cir. 2004) (unpublished) (defendant was charged with possession of sawed off shotgun and the court upheld a four level departure where the defendant had loaned the gun to a friend who returned it sawed off and where no evidence that defendant possessed the shotgun for any unlawful purpose and where possession would not "cause or threaten the harm or evil sought to be prevented by the law proscribing the offense"); *United States v. Clark,* 128 F.3d 122 (2d Cir. 1997) (remanding-district court has discretion to depart downward on lesser harms theory in felon in possession case where defendant had purchased gun as a gift for his brother and thus not engaged in activity Congress meant to proscribe); *U.S. v. Barajas-Nunez,* 91 F.3d 826 (6th Cir. 1996) (not plain error to depart under lesser harms provisions of §5K2.11 where defendant had illegally reentered country after having been deported when he believed his girlfriend was in grave danger of physical harm and wanted to obtain surgery for her, but remanded to explain extent of departure); *United States v. Hadaway,* 998 F.2d 917, 919-20 (11th Cir. 1993) (Court has power to depart downward if possession by a felon threatened lesser harm than statute intended to prevent.)

     3.     *Mr. Akerly's unusual family circumstances including, but not limited to, the critical illness of his 10 year old son, the needs of his 12 year old daughter, particularly in light of the recent murder of their mother and the importance of Mr. Akerly maintaining the family business and justify a departure pursuant to U.S.S.G. §5H1.6.*

A.    The Children

The policy statement in U.S.S.G. §5H1.6 states that "family ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." However, it is now well settled that Section 5H1.6 is not a prohibition, but rather an indication that exceptions should be invoked where the circumstances are not "ordinary" or "generally" present. See, *United States v. Gaskill*, 991 F.2d 82, 85-86 (3rd Cir. 1993) (downward departure justified for extraordinary family circumstance where defendant's wife suffered substantial mental illness).

In *Gaskill*, the Court went on to state that the extraordinary family circumstances include not only mental illness but also physical illnesses, disabilities, and other related ailments that would impose an extreme hardship upon family members in the event that the defendant is incarcerated. See also: *United States v. Sweeting*, 213 F.3d 95 (3rd Cir. 2000) (holding that with a proper factual basis a court may consider extraordinary family responsibilities); *United States . v. Milikowsky,* 65 F.3d 4, 7 (2nd Cir. 1995); *United States v. Morken*, 790 F.Supp. 1063, 1064 (E.D. Wash. 1992) (Instead of imposing 33-month sentence in narcotics conspiracy, district court departed downward to 6 months incarceration followed by 6 months of home detention where the defendant was a single mother of six children, defendant's relative would most likely be unable to care for the children, resulting in foster care placement, and "some of the children exhibited social and school problems.") The courts have also granted substantial departures where the defendant was charged with a weapons or drug crime that was ordinary in nature, and where the wife, children or other family members were unusually dependent upon him. *United States v. Gauvin,* 173 F.3d 798, 806-08 (10th Cir. 1999) (Fourteen-month departure in case involving assault on a federal officer with a dangerous weapon; the defendant was a father and

15

supporter of his wife and four young children; wife could barely support family, and she was in

danger of losing custody of the children.), *United States v. Londondo*, 76 F.3d 33, 36 (2nd Cir.

1996) (Court held that: "Specifically, we observe that the 'beneficiaries of the downward

departure [in both cases] were the dependent and vulnerable people to whom the defendants had

demonstrated long-term financial and emotional commitments."); *United State v. Johnson*, 964

F.2d 124 (2nd Cir. 1992). In *Johnson*, the Court upheld the District Court's 13 level downward

departure to a sentence of 6 months home confinement based on defendant's extraordinary

parental responsibilities. Although the government had argued that family circumstances, taken

alone, can never justify a downward departure, according to the Court, "both the Guidelines and

our case law, however, contemplate departure in extraordinary situations, and we find no reason

to believe that a particular family's circumstances can never be extraordinary. Nor do we find

any reason to believe that family circumstances warranting departure must include something

beyond extraordinary parental responsibilities." *Id.* at 129

The PSI at para. 43, pg. 12 makes reference to the defendant's ten-year-old son Damon's

physical condition, however, it does not adequately explain the extent of his illness and the

necessity for the defendant's presence to care, nurture, and provide for him. Damon was

diagnosed several years ago with autoimmune hepatitis which is a disease which attacks the

child's liver by turning his own immune system against himself. The diagnosis was made by

physicians at Children's Hospital in Pittsburgh, Pennsylvania. A copy of the diagnosis and

report from Children's Hospital is hereto attached and marked as Exhibit 21.[2]

The diagnostic sheet also indicates the various conditions that have to be carefully

monitored and reported immediately to physicians since this may indicate that the child's liver is

---

[2] The complete medical records from Children's Hospital were provided to the probation officer on December 10, 2005.

failing and he is in need of an immediate liver transplant. The defendant has been informed that there is a high probability that Damon will have to undergo a liver transplant. At the present time multiple medications are allowing him to exist, however, that existence is bubble-like. Because of his autoimmune deficiency, he is uniquely susceptible to viral and bacterial infections which can immediately stimulate an adverse autoimmune response and the rapid destruction of his liver. As a result he has missed substantial periods of school due to the fact that the defendant was instructed by physicians to keep him out of school if he has any signs of allergy, an upset stomach or belly pain, blood in his vomit or stool, or any adverse reactions. Any of these conditions require immediate medical attention by a pediatric immunologist. This necessitates either a direct trip to a local hospital and life flight to Children's Hospital in Pittsburgh or immediate transportation of the child to Children's Hospital in Pittsburgh for medical treatment.

For the past four years, Leon has had primary custody of the children with regular visitation with their mother. Their mother, Stacy Watral Akerly, prior to her murder sometime between April 17 and April 21, 2006 when her body was discovered off of Route 97 in Erie County and reported to the Pennsylvania State Police, was suffering from alcoholism and abuse of opiates. She had three previous drunk driving convictions and numerous violations of conditions of probation which resulted in her spending approximately two years in the Erie County Prison. She was unable to provide financial support to her son and daughter since she was not gainfully employed and further she possessed no valid driver's license due to her multiple DUI convictions, and therefore, if the children had to be taken to a doctor's office or hospital, she was unable to provide transportation.

Following the discovery of her body, the Pennsylvania State Police charged Thomas

Giusti with Stacy Akerly's murder.  A copy of the criminal complaint is attached and marked as

Exhibit 22.  The brutal murder of their mother and the potential loss of their father has caused

both Damon and his 12-year-old sister, Megan, extreme anxiety and emotional distress.  The

children are in the throes of despair following the murder of their mother and the potential loss of

their father.

Leon and his children have been evaluated by Dr. Robert Dowling, Ph.D., a clinical

psychologist regarding Leon and the special needs of the children.  A copy of Dr. Dowling's

report is attached and marked as Exhibit 23.  The report explains the importance of Leon in

maintaining the well being of the children and how it will affect them if he is incarcerated.

The various character letters submitted in support of Leon attest to the importance of his

presence in maintaining the wellbeing of the children.

### B.    The Family Business

Leon's parents are the owners of North America Powder Coatings located in Harborcreek

Township, Pennsylvania.  His father is 77 years old and his mother is 74 years old.  This family

business was started over 35 years ago by Leon's father and is the sole source of income for his

parents and a substantial portion of Leon's income.  Leon also has a business called Bio-Clean

which performs wood, tile, and ceramic restorations.  Leon is an integral part of the family

business and in fact runs the day-to-day operations of the business dealing with employees,

vendors, trucking companies, customers, etc.  As his mother states, the operation of the business

is dependent upon Leon's ability and presence.  The company employs anywhere from 8 to 20

people depending on the amount of work.  These employees depend upon the company for their

livelihood and the ability to support themselves and their families. Although Leon has other full and half siblings, he is the only son in the family.

The PSI on page 15 at para. 61 sets forth his income as reflected on his tax returns. What the PSI does not adequately develop is the fact that Leon actually received additional compensation from his parents in the form of living in a house owned by them as well as having the company pay the monthly payment on his 2003 GMC pickup truck which is used for work. As indicated on page 14, para. 59, his parents have promised Leon that he will inherit the business from them. This is not unusual for a son or family member to work at a reduced pay scale with the expectation of acquiring the business after his parents either retire or pass on. For example, this is very typical in the dairy farming business where a farmer has one or more sons come into the business with him and then acquire the farm when he retires or passes on. During the time that they work for their father, they may put in many hours and receive low pay. However, they live on the property and have the use of vehicles as well as other amenities to raise their own families. Leon hopes some day to be able to bring his son Damon into the business particularly in light of the fact that he has a serious illness and his employability will be very minimal at best since no employer would want to hire somebody who is a potential major health catastrophe. He has further indicated that his son desires to come into the family business after high school and work for his father as Leon now works for his parents.

A sentence other than community confinement coupled with community service will not only impact Leon and his family but will also impact the employees who depend upon him to provide work so they can maintain their families. Decent jobs in Erie County are hard to come by particularly in the manufacturing sector. In talking to several of Leon's employees, they have indicated that after working there so many years they do not know where they would be able to

go and obtain similar employment due to the downturn in manufacturing business in Erie County over the past decade.

It is important for the Court to know that the previous sentence that Leon served from November 29, 1993 to June 27, 1994 provided for work release so he could maintain his function at the business. Further, the indirect criminal contempts also provided for work release since it was necessary for him to work to support his children. At no time either during work release or during his period of parole was Leon ever violated for a dirty urine or for missing his periodic appointments with his probation officer and attending various therapy sessions as recommended by his probation officer. His compliance in the past is a very good barometer of his compliance with any sentence this Court will impose.

4.    *Mr. Akerly's criminal history score of 6 placing him in Criminal History Category III significantly over-represents his criminal history.*

The probation officer calculates a total criminal history of 6 points by aggregating 3 points for his prior state court drug conviction in 1993 and 3 additional points for indirect criminal contempt sentences concerning PFAs with his then estranged wife Stacy Akerly. It is the defendant's position as set forth in his objections to the PSI that a criminal history score of 6 particularly the 3 additional criminal history points for the indirect criminal contempt sentences overstates the magnitude of his prior record.

First, Leon was 24 years old at the time of his first conviction in 1993. As indicated in the objections, Leon like many people of his generation acted in an immature and unjustified fashion by selling and possessing marijuana. Further, the length of time from his first offense in 1993 to the current offense in 2005 is 12years. During that 12 year period the defendant never violated any conditions of probation nor was he charged with any criminal offense.

Second, the indirect criminal contempts grossly overstate his prior record when the true circumstances are considered.

In December 2000, Leon and his estranged wife were living in different residences. The children were being shuttled back and forth pursuant to an informal custody arrangement between them. In December 2000, Leon became concerned that his son was being molested by Stacy's then current boyfriend. Further, he would be called by his daughter Megan, who would tell him that the boyfriend was treating her and Damon poorly and this would cause him to come to Stacy's residence to get the children. This led to an altercation between Leon and Stacy's then boyfriend which caused her to obtain a protection from abuse order on December 28, 2000 from the Erie County Court of Common Pleas. These issues continued to simmer back and forth and as a result Leon was held in contempt of the PFA by going to Stacy's residence on two consecutive days – February 21-22, 2001. Later in March 2001, Leon was called by Megan expressing the same complaints regarding Stacy's then boyfriend and he returned to the residence on March 8, 2001. As a result he was again held in indirect criminal contempt.

On July 5, 2001, Leon filed a PFA on behalf of his children (who claimed abuse) against his then wife's boyfriend, Douglas Cordray. (PSI p. 12-13, para. 46) The Court granted the PFA order against Mr. Cordray and instructed him to stay away from the children. This obviously caused a significant problem because he was seeing their mother with whom the children lived at the time. Ultimately, Stacy wrote to counsel indicating that she had been untruthful in her PFA complaints that resulted in Leon being held in contempt of the PFA order and expressing her desire to get back together with Leon. A copy of that handwritten letter to counsel was obtained from Karen Klapsinos, Esquire on May 8, 2006 and is attached hereto as Exhibit 24.

The letter makes abundantly clear that Stacy lied while under oath in order to obtain a PFA to make sure that Leon wouldn't be able to come to the house to see the children and confront her then live-in boyfriend. She was also expressing her desire that the PFA order be withdrawn so they could renew their relationship. These are unusual circumstances where the person who files the complaint later admits to counsel that the allegations were untrue and she wants the PFA order removed. As a result of this letter, no further violations of a PFA order were claimed by either by Stacy or Leon and ultimately they parted their ways but maintained a very friendly relationship between themselves. Because of Stacy's alcoholism and drug addiction and spending time in the Erie County Prison, Leon obtained primary custody of the children and has continued to maintain that custody through present.

In *United States v. Shoupe (II)*, 988 F.2d 440, 447 (3rd Cir. 1993); *United States v. Shoupe (III)*, 35 F.3d 835 (3rd Cir. 1994), the Third Circuit instructed that the sentencing court can reduce the criminal history score if the prior convictions overstate the extent of the criminal conduct. Indeed, U.S.S.G. 4A1.3(b)(1) specifically anticipates and permits a Court to depart downward due to an over-representation of criminal history. Section 4A1.3(b)(1) provides:

> 1. *STANDARD FOR DOWNWARD DEPARTURE. –If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted.*

The defendant would respectfully request that this Court consider the age and circumstances surrounding the defendant's only other adult conviction and the highly unusual nature of the PFA complaints and the complainant's admission to counsel that the allegations were untruthful. The defendant would therefore request that this Court reduce the criminal history accordingly.

## V.     THE FRANK DIGELLO MATTER

In the fall of 2005, counsel engaged in plea bargain negotiations with AUSA Sanner. During those negotiations she informed counsel that she believed an additional 2 point enhancement would be appropriate due to the fact that the .22 caliber Beretta handgun had been stolen from Frank DiGello. Counsel strenuously objected and informed AUSA Sanner that the defendant had in fact purchased the firearm from Mr. DiGello. Further, counsel provided Ms. Sanner with a copy of a check issued on the account of Bio Clean to Frank DiGello dated November 2, 2002 in the amount of $300.00 to pay for the .22 caliber Beretta pistol.

On July 17, 2003, DiGello called the Pennsylvania State Police to report the theft of the .22 caliber Beretta pistol from his garage. Trooper David Stetson responded to the call and filled out and prepared an incident report relative to the theft complaint. A copy is thereto attached and marked as Exhibit 25. Trooper Stetson reports that DiGello claimed that unknown actor(s) entered his garage via "unknown means." He further claimed that the actor(s) then opened a drawer to a wooden stand which contained the Beretta gun case and removed the Beretta handgun along with another handgun. DiGello then claimed that the case was closed and inserted back into the drawer and the actor fled the scene undetected. This was a total fabrication on the part of DiGello. This theft claim was made to support an insurance claim for the value of the .22 caliber Beretta and the other handgun that was falsely claimed to have been stolen from the garage. After receiving a copy of the cancelled check, Ms. Sanner informed the Case Agent who re-interviewed DiGello on December 5, 2005. During that interview DiGello reversed course and now claims that he was a straw purchaser of the .22 caliber Beretta for the defendant and was paid the sum of $300.00 for the handgun. He further admitted that he filed a false stolen

gun report with Trooper Stetson and made false statements to the Case Agent.  This conduct is a clear violation of 18 U.S.C. §1001(a)(2) (False Reports to Federal Agents) and carries a maximum penalty of 5 years imprisonment and up to a $250,000.00 fine; and 18 Pa.C.S.A. §4906 (False Reports To Law Enforcement Authorities) which subjects the violator to a penalty of One (1) year and $2,500.00 fine.

The PSI report at p. 5, para. 11 reflects Mr. DiGello's latest version regarding the .22 caliber Beretta and how Mr. Akerly ended up with that firearm.  Mr. DiGello is a compulsive liar who has committed serious crimes in lying to both the Pennsylvania State Police and the Case Agent concerning the firearm.  Further, Ms. Sanner reversed course regarding an additional 2 point enhancement for receipt of a stolen firearm only after receiving the cancelled check from counsel.  However, instead of charging Mr. DiGello with making false statements to law enforcement authorities, the government now seeks to advance his claim as being truthful even though he has lied to them repeatedly in the past.  Mr. DiGello's most recent version should be rejected by this Court as utterly unreliable hearsay, particularly in light of the previous false statement he made to authorities.

## VI.    ANALYTICAL FRAMEWORK

As the Court is undoubtedly aware, on January 12, 2005 the United States Supreme Court inexorably altered the doctrinal landscape of federal sentencing with its decisions in *United States v. Booker*, and *United States v. Fanfan*, 543 US----, 125 S. Ct. 738, 160 L.Ed.2d 621 (2005) (hereinafter referred to collectively as *Booker/Fanfan*). The Court in *Booker/Fanfan* made it clear that United States District Courts are no longer bound or restricted by a mandatory

and unwavering application of the United States Sentencing Guidelines.  Writing for the merits

majority, Justice Mr. Stevens wrote that:

> If the Guidelines as currently written could be read as
> merely advisory provisions that recommended, rather
> than required, the selection of particular sentences in
> response to differing sets of facts, their use would not
> implicate the Sixth Amendment. We have never
> doubted the authority of a judge to exercise broad
> discretion in imposing a sentence within a statutory
> range.

As well, Justice Breyer, in writing for the majority in the remedial portion of the decision, wrote:

> We answer the question of remedy by finding the
> provision of the federal sentencing statute that makes
> the Guidelines mandatory, 18 U. S. C. A. §3553(b)(1)
> (Supp. 2004), incompatible with today's constitutional
> holding.

Counsel believes that the proper application of ***Booker/Fanfan*** requires that a sentencing

court consider the Guidelines along with certain other statutory factors. The ***Booker/Fanfan***

Court noted that its holding requires "a sentencing court to consider Guidelines ranges, see 18 U.

S. C. §3553(a)(4) (Supp. 2004), but it permits the court to tailor the sentence in light of other

statutory concerns as well, see §3553(a) (Supp. 2004)." ***Booker*** at 3, (Stevens, J).

.The Third Circuit recently issued a decision setting forth its interpretation of *Booker* and

how it believes sentencing should occur.  In ***United States v. Davis***,  407 F.3d 162, 163  (3rd Cir.

2005) the Third Circuit held that:

> ***Booker*** brought about sweeping changes in the realm of
> federal sentencing. Drawing upon its reasoning in ***Jones,***
> ***Apprendi,*** and ***Blakely,***(footnote omitted) the ***Booker***
> majority held that mandatory enhancement of a sentence
> under the Guidelines, based on facts found by the court
> alone, violates the Sixth Amendment ***Booker.***, 125 S.Ct. at
> 756. To remedy this constitutional infirmity, the Court

excised that provision of the statute making application of the Guidelines mandatory. *Id.* at 764. In the aftermath of ***Booker,*** the Federal Sentencing Guidelines once a mandatory regime circumscribing the discretion of district court judges are "effectively advisory " *Id.* at 757. Under the post- ***Booker*** sentencing framework, District Courts will consider the applicable advisory Guidelines range in addition to factors set forth in 18 U.S.C. § 3553(a). *See* ***Booker*** 125 S.Ct. at 764-65. ***Booker*** is applicable to all cases on direct review. *Id.* at 769.

The defendant asks that the Court give "meaningful consideration to the § 3553(a) factors" and consider the advisory Guidelines as part of it's sentencing process. See ***United States v Cooper***, 437 F.3d 324 (3rd Cir. 2006).

As a result of ***Booker/Fanfan,*** no longer are courts *required* to impose a sentence "within the range" as provided for in the United States Sentencing Guidelines and as previously required by 18 USC § 3553(b)(1). Courts may now take into consideration the myriad of sentencing factors historically considered under 18 USC § 3553. The following is our suggestions and recommendations addressing all of the sentencing factors the Court is now at liberty, but certainly not required, to consider.

It is respectfully requested that the Court consider, along with the United States Sentencing Guidelines, the following factors and analyses.

1) **18 USC § 3553**

Title 18 U.S.C.A. §3553(a) (main ed. and Supp. 2004) provides:

"Factors to be considered in imposing a sentence.—The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

"(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

"(2) the need for the sentence imposed—

"(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

"(B) to afford adequate deterrence to criminal conduct;

"(C) to protect the public from further crimes of the defendant; and

"(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

"(3) the kinds of sentences available;

"(4) the kinds of sentence and the sentencing range established for—

"(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

"(i) issued by the Sentencing Commission pursuant to Section 994(a)(1) of Title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under Section 994(p) of Title 28); and

"(ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

\*\*\*

"(5) any pertinent policy statement—

"(A) issued by the Sentencing Commission pursuant to Section 994(a)(2) of Title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under Section 994(p) of Title 28); and

"(B) that, except as provided in Section 3742(g), is in effect on the date the defendant is sentenced.

"(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

"(7) the need to provide restitution to any victims of the offense."

Initially, counsel would stress the importance of the parsimony provision of 18 U.S.C. §

3553.  That provision provides that "The court **shall** impose a sentence sufficient, **but not**

**greater than necessary**, to comply with the purposes set forth in paragraph (2) of this subsection. (Emphasis added).  Thus, counsel posits that the Court is statutorily bound **not** to impose a sentence greater than what would be necessary to comply with the relevant sentencing provisions discussed below. In **U.S. v. Wilson**, Case No. 2:03-CR-00882 (D. Utah Jan. 13, 2005) the court stated, "It is possible to argue that this provision requires the courts to impose sentences below the Guidelines range, because Guidelines sentences are not parsimonious." *Id.* at 21.  **In U.S. v. Brown,** 2005 WL 218741 (Feb 10, 2005) the court viewed the parsimony provision as requiring an analysis of all guideline related and non-guideline related sentencing factors.

Ten years ahead of his time, the Honorable Jack Weinstein of the United States District Court for the Eastern District of New York wrote: "A key provision [of sentencing] embodies the concept of "parsimony," a principle of the American Bar Association Standards for Criminal Justice. *See* American Bar Association, Standards For Criminal Justice, Chapter 18, "Sentencing Alternatives and Procedures", 18- 3.2(iii) ("Parsimony in the use of punishment is favored. The sentence imposed should therefore be the least severe sanction necessary to achieve the purposes for which it is imposed ...") (1993). See also Richard S. Frase, *Sentencing Guidelines in the States: Lessons for State and Federal Reformers,* 6 Federal Sentencing Reporter 123, 124 (1993). This principle, when applied to interpretation of criminal statutes, is known as lenity. "The Court will not interpret a federal criminal statute so as to increase the penalty ... when such an interpretation can be based on no more than a guess as to what Congress intended."" *United States v. Abbadessa*, 848 F.Supp.369, 378 (E.D.N.Y.1994). *See, also United States v. Granderson,* 114 S.Ct. 1259 (1994).

Counsel believes that a strong and persuasive argument exists that the parsimony provision of 18 USC § 3553 requires that the Court impose the minimum sentence possible under the circumstances taking into account all of the circumstances enumerated herein.

The defendant would also ask the Court to consider the need for an appropriate sentence in light of all of the circumstances enumerated herein.  Specifically, 18 USC §3553(a)(2) also directs the sentencing court to consider:

> the need for the sentence imposed—
>
> "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> "(B) to afford adequate deterrence to criminal conduct;
> "(C) to protect the public from further crimes of the defendant; and
> "(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Indisputably prior to *Booker* courts were often prohibited from considering many of these factors absent an extraordinary---and often impossible demonstration--- that the facts and circumstances of their cases removed them from the "heartland" of the Guidelines. *See, e.g.* *Koon v. United States*, 116 S.Ct 2035 (1996).  Quite often the required analysis prohibited courts from considering many of the policies and considerations behind our penal system, sentencing policy and the individual circumstances of the crime itself.  To be sure, courts were often obligated to impose a sentence of imprisonment regardless of the facts and circumstance. *See, e.g* U.S.S.G. § 5C1.1 (describing limited circumstances in which court can impose sentence other than imprisonment.)  Freed of the mandatory application of the Guidelines, courts can and indeed *should* look at many of the others factors involved in imposing a just and meaningful sentence.

29

## VII.    CONCLUSION

In conclusion, the defendant respectfully requests that this Court depart downward from the advisory Guidelines for the reasons set forth herein and impose a sentence of community confinement that allows for the defendant to serve a portion of his sentence on a work release program with concomitant electronic monitoring followed by a substantial period of supervised release.

Respectfully submitted,

**AMBROSE, FRIEDMAN and WEICHLER**

BY s/Leonard G. Ambrose, III, Esquire
Leonard G. Ambrose III, Esquire
Attorney for Defendant
319 West 8th Street
Erie, Pennsylvania  16502
814/452-3069
Supreme Court I.D. # 18824

30